AO 106 (Rev. 06/09) Application for a Search Warrant

# UNITED STATES DISTRICT COURT

for the

Eastern District of Missouri

**FILED**

SEP - 3 2014

U.S. DISTRICT COURT
EASTERN DISTRICT OF MO
ST. LOUIS

In the Matter of the Search of

In the Matter of the Search of Information Associated with
rajivsant@yahoo.com and bsnkumar@yahoo.com that is Stored at
Premises Controlled by Yahoo! Inc. (See Attachment A)

)
)
)
)
)
)

Case No.     4:14 MJ 6167 TCM

## APPLICATION FOR A SEARCH WARRANT

I, Special Agent Cynthia Dockery , a federal law enforcement officer or an attorney for the government
request a search warrant and state under penalty of perjury that I have reason to believe that on the following property:

In the Matter of the Search of Information Associated with rajivsant@yahoo.com and bsnkumar@yahoo.com that is Stored at Premises Controlled
by Yahoo! Inc. (See Attachment A)

located in the _____NORTHERN_____ District of _____CALIFORNIA_____ , there is now concealed

### SEE ATTACHMENT B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| *Code Section* | *Offense Description* |
|---|---|
| 18 USC §§ 371 and 1349 | Conspiracy |
| 18 USC §§ 1341 and 1343 | Mail and Wire Fraud |
| 15 USC § 78dd-1 | the Foreign Corrupt Practices Act |

The application is based on these facts:

### SEE ATTACHED AFFIDAVIT WHICH IS INCORPORATED HEREIN BY REFERENCE

☑ Continued on the attached sheet.

☐ Delayed notice of        days (give exact ending date if more than 30 days:                    ) is requested
under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

Cynthia Dockery, Special Agent
Federal Bureau of Investigation

*Printed name and title*

Sworn to before me and signed in my presence.

Date:     September 3, 2014

*Judge's signature*

City and state:   St. Louis, MO

Honorable Thomas C. Mummert III, U.S. Magistrate Judge

*Printed name and title*

AUSA:   John M. Bodenhausen

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI

**AFFIDAVIT IN SUPPORT OF**
**AN APPLICATION FOR SEARCH WARRANTS**

I, Special Agent Cynthia Dockery, being first duly sworn, hereby depose and state as
follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.      I make this affidavit in support of applications for search warrants for information
associated with certain accounts that are stored at premises controlled by Google, Inc.
("Google"), an electronic mail ("email") provider headquartered at 1600 Amphitheatre Parkway,
Mountainview, California 94043, and information associated with certain accounts that are
stored at premises controlled by Yahoo! Inc. ("Yahoo!"), an email service provider
headquartered at 701 First Avenue, Sunnyvale, California 94089.  The information to be
searched is described in the following paragraphs and in Attachment A.  This affidavit is made in
support of applications for search warrants under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and
2703(c)(1)(A) to require Google and Yahoo! to disclose to the government copies of the
information (including the content of communications) further described in Section I of
Attachment B.  Upon receipt of the information described in Sections I and II of Attachment B,
government-authorized persons will review that information to locate the items described in
Section III of Attachment B.

2.      I am a Special Agent with the Federal Bureau of Investigation, and have been
since September 22, 2002.  I am currently domiciled in St. Louis, Missouri, and assigned to
investigate public corruption crimes, including cases concerning the Foreign Corrupt Practices
Act (FCPA).  I have received training in detecting and investigating white-collar crimes,

including crimes against the government, bribery of a public official, wire fraud, mail fraud, money laundering and other related criminal offenses.

3.　　　This affidavit is intended to show merely that there is sufficient probable cause for the requested warrants and does not set forth all of my knowledge about this matter.

4.　　　I submit this affidavit in support of applications for a search warrant for the email accounts "pbagencieshyd@gmail.com" (the "**PBA TARGET ACCOUNT**"), and "srininarra@gmail.com" (the "**NARRA TARGET ACCOUNT**"), all controlled by the email service provider known as Google, as further described in Attachment A, and for a search warrant for the email accounts "rajivsant@yahoo.com" (the "**SANT TARGET ACCOUNT**"), "bsnkumar@yahoo.com" (the "**KUMAR TARGET ACCOUNT**"), all controlled by the email service provider known as Yahoo!, as further described in Attachment A. I believe, based on my investigation, including the names displayed in various email headers, email text, and automatic email signatures, that the TARGET ACCOUNTS were used by the subscribers listed herein, who I believe to be, for the reasons set forth herein, involved in violations of federal law.

5.　　　Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that violations of 18 U.S.C. §§ 371 and 1349 (Conspiracy), 18 U.S.C. §§ 1341 and 1343 (Mail and Wire Fraud), and 15 U.S.C. §§ 78dd-1, *et seq.* (the Foreign Corrupt Practices Act) have been committed by Rajiv SANT, Buddhavarapu Srinivasa Nageswara ("BSN") KUMAR, PB AGENCIES, and Srini NARRA. There is also probable cause to search the information described in Attachment A for evidence of these crimes further described in Attachment B.

2

## BACKGROUND REGARDING THE FCPA

6. The Foreign Corrupt Practices Act of 1977, as amended, Title 15, United States Code, Sections 78dd-1, *et seq*. ("FCPA"), was enacted by Congress for the purpose of, among other things, making it unlawful for certain classes of persons and entities to act corruptly in furtherance of an offer, promise, authorization, or payment of money or anything of value to a foreign government official for the purpose of assisting in obtaining or retaining business for, or directing business to, any person.

7. It is my understanding that the FCPA makes it a crime for a domestic concern or an agent of a domestic concern to (1) willfully; (2) make use of the mails or any means or instrumentality of interstate commerce; (3) corruptly; (4) in furtherance of an offer, payment, promise to pay, or authorization of the payment of any money, or offer, gift, promise to give, or authorization of the giving of anything of value to; (5) any foreign official; (6) for purposes of either influencing any act or decision of such foreign official in his official capacity or inducing such foreign official to do or omit to do any act in violation of the lawful duty of such official or securing any improper advantage; (7) in order to assist the domestic concern in obtaining or retaining business for or with, or directing business to, any person.

## JURISDICTION

8. This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711. 18 U.S.C. §§ 2703(a), (b)(1)(A) & (c)(1)(A). Specifically, the Court is "a district court of the United States . . . that – has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

3

**PROBABLE CAUSE**

9.     Anheuser-Busch InBev ("ABI") is a brewer and distributer of beer worldwide, headquartered in Belgium but with substantial operations in the United States and Brazil. ABI was formed in November 2008 by a merger between Anheuser-Busch and the Belgium-based InBev. ABI is presently traded on the New York stock exchange under the stock symbol "BUD."

10.     In 2012, the SEC received a whistleblower report of bribery by ABI and its joint venture in India and issued subpoenas to the company. The SEC referred the case to the Department of Justice, Criminal Division, Fraud Section, which opened an investigation in May 2013. Since that time, through its legal counsel, Covington & Burling, ABI has provided documents and oral presentations. In addition, the government has interviewed and received information from a former ABI/Crown executive ("Witness 1"). These documents and information, together with additional information and materials obtained through the FBI's investigation, reveal the following:

11.     ABI has two operations in India: (1) the Crown Brewery in Hyderabad, Andhra Pradesh, is wholly-owned and operated by ABI (and was owned by Anheuser-Busch pre-merger); and (2) a distribution company, India InBev International Private Limited ("IIIPL"), which is a joint venture and majority-owned by ABI's joint venture partner, RJ Corporation. IIIPL was InBev's sole presence in India before its merger with Anheuser-Busch.

12.     Anheuser-Busch acquired Crown in June 2008 to brew and sell Budweiser products, and Crown's financials were consolidated into the financial statements of Anheuser-Busch. Crown's head of operations initially reported to the vice president of international

4

operations for Anheuser-Busch in St. Louis, Missouri, but following the November 2008 merger with InBev, he reported to executives at ABI's Asia-Pacific zone department.

13.    IIIPL was formed as a joint venture between InBev and RJ Corporation in or around January 2007.  RJ Corporation is a private Indian company primarily involved in marketing soft drinks and is owned by Ravikant Jaipuria.  RJ Corporation owned a majority 51% of IIIPL and InBev maintained a 49% ownership.  IIIPL did not own its own breweries in India, but contracted with local brewers.  Following the Anheuser-Busch-InBev merger, Crown Brewery's sales and marketing functions were transferred to IIIPL in April 2009.

14.    Raja Mukherjee was the CEO of IIIPL from 2007 to around March 2010.

15.    B.J. Kancharla was an ABI employee and worked as CEO of Crown Brewery from April 2008 to February 2012.

16.    Atul Agarwal was the Crown Brewery Chief Financial Officer who moved to IIIPL in around mid-2009 to become IIIPL's head of finance.

17.    Rajiv SANT was the Business Development Director for IIIPL at all relevant times, and had previously worked for RJ Corporation.

18.    PB AGENCIES was a third party "promoter" for IIIPL's beers in Andhra Pradesh.

19.    BSN KUMAR was the CEO of PB Agencies, a promoter for IIIPL in Andhra Pradesh.

20.    Lotus Corporation was a third party promoter for IIIPL's beers in Tamil Nadu.

21.    Srini NARRA was the owner and operator of Lotus Corporation.

5

*Promoters in Andhra Pradesh*

22.     The manufacture and sale of alcoholic beverages is highly regulated in India. In the state of Andhra Pradesh, where Crown Brewery is located, all sales are to the government. The government, through the Andhra Pradesh Beverages Corporation Limited ("APBCL") headed by a managing director, buys the product and resells it to private retailers, charging a commission on a per-unit basis. The Commissioner of the Excise Department oversees APBCL, and handles all matters relating to granting licenses to manufacture alcohol and operate breweries and granting licenses determining which of certain brands can be sold in Andhra Pradesh.

23.     At times, ABI used third party "promoters" to sell its products in India. Promoters are typically independent businesses that have expertise in the alcoholic beverage market of a certain geographic area. The promoters assist brand owners and manufacturers of alcoholic beverages by marketing their products to local retailers, for which the promoters charge a commission on a per-unit basis. In a state like Andhra Pradesh, this means that a promoter will, through its marketing efforts, guide retailers to pick the promoter's client's brands from the government warehouses.

24.     Kingsway was a promoter for IIIPL in Andhra Pradesh from around 2007 until June or July 2009. According to Witness 1 and documents provided by ABI, IIIPL hired Kingsway without performing any due diligence.

25.     On April 27, 2009, Kingsway paid 350,000 rupees (approximately $8,700) to a travel agent to purchase a European vacation for the Managing Director of APBCL. According to Witness 1, the package was a trip to Venice, Lucerne, Paris and Dubai for the Managing Director and his family, without even an ostensible business purpose.

6

26. Kingsway invoiced the trip to IIIPL on April 30, 2009. The CEO of IIIPL, Raja Mukherjee, approved the payment and categorized it as "marketing expenses."

27. In December 2009, Atul Agarwal, the CFO for both Crown and IIIPL, reported the incident in an email to the ABI Vice President Finance for Asia Pacific and IIIPL board member.

### *PB AGENCIES and BSN KUMAR*

28. In the same December 2009 email, Agarwal also reported uncovering other bribes made by another promoter working for IIIPL called PB AGENCIES. PB AGENCIES was another promoter hired by IIIPL in or around mid-2008 (and retained by ABI post merger). PB AGENCIES was headed by Buddhavarapu Srinivasa Nageswara ("BSN") KUMAR.

29. As explained below, PB AGENCIES, using the PBA TARGET ACCOUNT, and BSN KUMAR, using the KUMAR TARGET ACCOUNT, were involved in violations of federal law, including conspiracy, mail and wire fraud, and the Foreign Corrupt Practices Act. KUMAR, using the KUMAR TARGET ACCOUNT and KUMAR's assistant, using the PBA TARGET ACCOUNT, would communicate with IIIPL employees as part of a scheme to pay Andhra Pradesh officials in order to increase sales, including sending IIIPL account statements for their "services."

30. According to Witness 1, it was well known that Raja Mukherjee, CEO of IIIPL, was friends with BSN KUMAR; that PB AGENCIES had no business expertise in the brewing industry, and no familiarity with the alcohol beverage business in the city of Hyderabad and the surrounding areas; and that PB AGENCIES had a bad reputation in the wider marketplace for taking shortcuts with government officials.

7

31.    According to Witness 1, it was clear to industry experts in Andhra Pradesh that PB AGENCIES had nothing to offer other than the possibility of getting access to government officials.

32.    From April 2009 to July 2011, PB AGENCIES was paid a total of approximately $2 million by ABI and IIIPL, for which PB AGENCIES performed no verifiable services.

33.    According to Witness 1 there was a lack of transparency in how PB AGENCIES' expenses were billed and reimbursed, and whenever he requested clarity on payments made to PB AGENCIES, he was ignored by IIIPL's Finance Director who purportedly did not want to upset IIIPL management.

34.    PB AGENCIES would charge IIIPL for unexplained "trade schemes," "service fees" and "display charges." For example, on or about September 10, 2010, BSN KUMAR, using the KUMAR TARGET ACCOUNT, sent a bill including some of these "trade schemes" and "display charges" to IIIPL's Business Development Director, Rajiv SANT, and asking him to submit payments to PB AGENCIES.

35.    According to emails provided by ABI, BSN KUMAR sent at least three account statements to Rajiv SANT using the KUMAR TARGET ACCOUNT throughout 2011.

36.    BSN KUMAR's assistant would also regularly use a private email account, the PBA TARGET ACCOUNT, to send statements of account (including the unexplained "display charges") or other IIIPL-related business to BSN KUMAR at the KUMAR TARGET ACCOUNT and IIIPL employees while copying Rajiv SANT. Likewise, IIIPL employees would communicate with BSN KUMAR and his assistant by emailing them at the KUMAR TARGET ACCOUNT and the PBA TARGET ACCOUNT.

8

37.     On July 30, 2009, Raja Mukherjee emailed IIIPL executives, including IIIPL's Business Development Director, Rajiv SANT, and copying BSN KUMAR at the KUMAR TARGET ACCOUNT. In the email, Mukherjee set out the terms of an agreement with PB AGENCIES, which included a commission of 3 Rupees per case sold.

38.     According to documents provided by ABI, however, PB AGENCIES had no written contract with IIIPL (which was not an acceptable practice within the industry when using third party promoters) until May 2011, and no due diligence was done on the company.

39.     According to Witness 1, PB AGENCIES brokered a secret meeting in Hyderabad in July 2009 for high level executives from ABI, Raja Mukherjee, and RJ Corporation's owner, Ravikant Jaipuria, with the Chief Minister of Andhra Pradesh.

40.     The main purpose of the meeting, according Witness 1, was to arrange for some sort of payment to the Chief Minister or his office to help pressure the APBCL to increase IIIPL's business. Another purpose was to seek the Chief Minister's help in resolving a land dispute between the Andhra Pradesh government and IIIPL, which was trying to build another brewery on land that Andhra Pradesh was trying to take back. Following the meeting, the land remained with IIIPL and sales to APBCL improved.

41.     In a September 2009 email to Mukherjee, SANT reported the increasing sales for the brands that PB AGENCIES was charged with promoting. He explained that "[t]he kind of penetration and presence we have got in just 9 months is superb and needs to be handled carefully so that we can sustain and grow." SANT also noted that "APBCL was contacted and the senior-most people impressed upon to help us as we had helped them during summertime." SANT explained that APBCL had assisted them by instituting a policy helping IIIPL gain a

9

market share, and that "[t]he person concerned is willing to pursue this policy in the coming months if we agree to pay the price."

42.     On November 24, 2009, a Crown employee working for the IIIPL joint venture sent an email to Atul Agarwal, a Crown employee working as IIIPL's Chief Financial Officer, and the Crown CEO, B.J. Kancharla, inquiring why IIIPL was paying duties and moving hundreds of thousands of cases of IIIPL beer to APBCL when there was already a "high" stock sitting at the depots. According to ABI, Kancharla's work email used an account whose domain was hosted in St. Louis, Missouri.

43.     On November 26, 2009, Agarwal responded to the group (including Kancharla), copied Raja Mukherjee, the IIIPL CEO, and stated that he had "checked with Raja and he has mentioned that there is a strategy due to which despite having stocks, we are requesting more primary sales." Agarwal instructed the employee to pay the excise duty and that "Raja would respond to this mail as soon as he is out from a meeting."

44.     Later that day, Mukherjee responded to the group (including Kancharla) and copied Rajiv SANT. Addressing Agarwal, Mukherjee wrote: "Certain discussions we are having with [the Managing Director of APBCL] can't be shared Atul. You know what's happening and you (and Rajiv [SANT]) are privy to all discussions. At this time I can't share or divulge any details to a large audience. Yes there is a risk but worth taking it."). Agarwal then responded to Mukherjee alone that same day: "Not sure what you meant. Any person would be curious to know that despite having stocks, why would you keep on increasing stocks despite slow movement in the market." Mukherjee replied, "Then stay ignorant. Ignorance is bliss."

10

45.     After sales continued to increase, Raja Mukherjee amended the original terms with PB AGENCIES on January 6, 2010, to increase its commission from 3 to 5 Rupees per case sold, as well as to increase its allowance for sales expenses and promoter staff salaries.

46.     According to documents provided by ABI, however, PB AGENCIES still had no written contract with IIIPL. Mukherjee only hand wrote and initialed the terms onto a hard copy of his original July 30, 2009 email.

47.     In July 2011, an IIIPL executive in charge of commercial affairs sent an email to other employees stating that PB AGENCIES' commissions would be reduced back to 3 Rupees per case.

48.     According to documents provided by ABI, IIIPL decided as early as April 2011 to take the settlement work PB AGENCIES was purportedly doing and contracting with different promoters.

49.     In reality, according to Witness 1, the ABI sales head in Andhra Pradesh had been trying repeatedly to get IIIPL to drop PB AGENCIES because it was unqualified to be a promoter, and it was unclear what it was actually doing.

50.     SANT and another IIIPL executive refused to completely sever ties with PB AGENCIES, but compromised by stripping it of its only "quantifiable" responsibilities. As a result, BSN KUMAR and PB AGENCIES were left with "no role other than collecting his 3 rupees a case check."

### Rajiv SANT and Direct Bribes

51.     Beyond the use of third party promoters, Rajiv SANT also directly sanctioned bribes to various government officials according to documents and communications provided by ABI. For example, on July 26, 2011, the IIIPL regional sales manager for Uttar Pradesh (RSM-

11

UP), emailed Rajiv SANT at his work email seeking approval to give cases of beer to the Excise Inspector for the city of Lucknow in Uttar Pradesh for a personal party. The RSM-UP explained that "[o]ur Excise Inspector is very co-operative [*sic*] person, so please consider the request."

52.     SANT approved the gift in a reply email, saying "Okay. Do not make it a practice, even if the person is nice and 'cooperative' as we do not break the law and whenever we do we are penalized."

53.     Despite his admonition not to make it a regular practice, SANT repeatedly approved gifts to officials in Uttar Pradesh in exchange for their assistance in steering business to IIIPL. In August 2011, the RSM-UP emailed SANT at his work email requesting permission to give cases of Budweiser pints to the General Manager of Indrapuram, Ghaziabad in Uttar Pradesh, for his birthday party. The RSM-UP explained to SANT that the General Manager "is a major person who gives retail order for Ghaziabad retails and all other compan[ies] are obliging him in shape of gifts or cash." SANT replied by email, "Ok. Approved."

54.     In October 2011, the RSM-UP requested permission to give 12-15 cases for excise officials and staff. SANT replied from his work email the same day, "Approved."

55.     In January 2012, the RSM-UP emailed an IIIPL employee, copying Rajiv SANT at his work email, regarding a "secondary scheme which we initiated in [Uttar Pradesh]," and providing "[d]etails of the required gifts" to government officials. The email included an attached spreadsheet, which set out how much beer had been sold in November and December 2011 in each individual region within Uttar Pradesh.

56.     In March 2012, the RSM-UP requested approval for 15 cases of beer for excise officials and staff on holiday. SANT's approval from his work email stated simply, "ok."

12

*Lotus Corporation and Srini NARRA*

57.     In the Indian state of Tamil Nadu, all alcohol sales, from distribution down to the retail level, are controlled by the state government. This includes essentially everything except brewing: shipping, pricing, operation hours, determining what brands are offered and the amount of each brand available. This means that all retail stores are government-owned stores, and the government either purchases from local manufacturers or imports products from brand owners outside the state. Because of the complete government control over sales, and the lack of private retailers operating in the alcohol sales business, there are fewer reasons for a brewer to use a third party promoter in Tamil Nadu than in other states where the markets are less government-controlled. Instead, if a company wants to sell its products in Tamil Nadu, it will put in an application for its brand to the government, through the Tamil State Marketing Corporation ("TASMAC"), and the TASMAC will then decide whether to award supply orders to the brand.

58.     According to Witness 1, a former ABI and Crown executive, Crown had refused to participate in selling its brands in Tamil Nadu beginning in 2008 because certain employees of the TASMAC expected paybacks to release supply orders for the brands. However, ABI, through its IIIPL joint venture, began selling beer in Tamil Nadu in 2011.

59.     In order to secure beer orders from the Tamil Nadu government, IIIPL retained a "promoter" in Tamil Nadu named Lotus Corporation, which was owned and run by Srini NARRA.

60.     As explained below, Srini NARRA, using the NARRA TARGET ACCOUNT, and Rajiv SANT, using the SANT TARGET ACCOUNT, were involved in violations of federal law, including conspiracy, mail and wire fraud, and the Foreign Corrupt Practices Act. NARRA,

13

using the NARRA TARGET ACCOUNT, would communicate with SANT, using the SANT

TARGET ACCOUNT as part of a scheme to influence officials by, among other things,

arranging for personal trips, including lodging and entertainment. NARRA also used the

NARRA TARGET ACCOUNT to email his debit note for his commission to SANT at the

SANT TARGET ACCOUNT.

61.     In February 2011, Rajiv SANT, using the SANT TARGET ACCOUNT, emailed

the IIIPL Vice President for commercial affairs a draft letter to the TASMAC requesting

registration of ABI's beer brands in Tamil Nadu. A final letter was then forward to Srini

NARRA at the NARRA TARGET ACCOUNT and copying Rajiv SANT.

62.     Lotus then began representing ABI before the TASMAC. According to Witness

1, however, Lotus had no office or staff, and NARRA was a resident of Andhra Pradesh, not

Tamil Nadu. He also had no experience in the alcohol or brewery business, or promotional

activity.

63.     Nonetheless, due to his efforts, according to documents provided by ABI, the

TASMAC ordered in April 2011 approximately 500,000 cases of beer for the May-July time

period. NARRA, using the NARRA TARGET ACCOUNT, then emailed his debit note for a

"promoter commission" to SANT at the SANT TARGET ACCOUNT and at his work email.

64.     In a June 10, 2011 email, on which the NARRA TARGET ACCOUNT was

copied, Rajiv SANT explained to IIIPL's head of finance and accounting that under agreed terms

with NARRA, ABI would pay Lotus 15 rupees per case. Lotus's duties under the agreement

included "manag[ing] TASMAC relationship," "relationship building with TASMAC" and

"arrang[ing] periodic orders."

14

65. According to documents provided by ABI, after NARRA began working on IIIPL's behalf, SANT traveled to Chennai to meet the Managing Director of the TASMAC and the Tamil Nadu Excise Commissioner in July 2011 and November 2011, and again for an "important meeting" in December 2011.

66. According to Witness 1, 15 rupees per case was unusually high in light of Tamil Nadu's system for alcohol sales and distribution, which limited promotional activity, and thus any role that a promoter could legitimately play in the process.

67. According to documents provided by ABI, in June 2011, another ABI Vice President working with IIIPL questioned the commission rate as too high and upon seeing the terms of the agreement, asked that the agreement not be formalized.

68. A January 10, 2012 email from an ABI marketing employee to the Lotus email account, and copying the NARRA TARGET ACCOUNT and Rajiv SANT at his work email, indicated that Lotus and Srini NARRA continued to work on ABI's behalf before the TASMAC without a signed agreement.

69. Srini NARRA also worked on IIIPL and ABI's behalf outside of Tamil Nadu, even though Lotus's only formal role was limited to promoting in Tamil Nadu. For example, NARRA was used as the "local contact" to facilitate Rajiv SANT's multiple meetings with the Andhra Pradesh Excise Minister, other excise officials, and the Managing Director of the APBCL throughout 2011. In particular, NARRA worked with SANT to persuade the Andhra Pradesh Minister of Excise & Prohibition to approve extra hours that would allow Crown Brewery to increase its production.

70. On March 18, 2011, Srini NARRA, using the NARRA TARGET ACCOUNT, sent an email to Rajiv SANT at his work email and the SANT TARGET ACCOUNT. Attached

15

to the email was a copy of a letter from the Andhra Pradesh Minister of Excise & Prohibition to the Secretary of Revenue, requesting that Crown be allowed 12 hours per day beyond normal working hours.

71.     The extra hours were approved ten days later, as NARRA, using the NARRA TARGET ACCOUNT, informed SANT when he emailed the approval letter to SANT's work email and the SANT TARGET ACCOUNT.

72.     On May 23, 2011, while the request was pending, Crown CEO B.J. Kancharla emailed SANT at his work account from Kancharla's work account, whose domain was hosted in St. Louis, Missouri. Kancharla accused SANT of using NARRA's "local 'influence'" and "local contact" to "handl[e] [Andhra Pradesh] Excise," meeting the Excise Commissioner and other excise officials "outside the office setting," and failing to be transparent about the nature of those discussions.

73.     The same day, SANT emailed a response to Kancharla's email, whose work account domain was hosted in St. Louis, Missouri. SANT acknowledged that he had met with AP excise officials outside of normal "office settings" multiple times, that he had "used local influence to get to the Minster" to request permission for "extra working hours," and "export permits." SANT complained that he had to work this way because the other joint venture employees, including Kancharla, were failing "to get it done" in there dealing with excise officials.

74.     Among his other roles as "local contact," Srini NARRA also apparently had a part in intervening for ABI and IIIPL with the Andhra Pradesh government in a land dispute, as well as arranging trips and other things of value for Andhra Pradesh officials. In August 2011, an IIIPL executive emailed NARRA at the Lotus email account, and copying both the NARRA

16

TARGET ACCOUNT and Rajiv SANT's work account, attaching letters that SANT had written to the Andhra Pradesh government over several years about trying to build another brewery on land that Andhra Pradesh was trying to take back. The email asked NARRA to "[p]lease see the attached scan copy and do the needful."

75.     That same month, NARRA sent three emails from the NARRA TARGET ACCOUNT account to Rajiv SANT's work account, attaching letters from Andhra Pradesh officials, including the Excise Minister, announcing upcoming visits to the city of Tirumala in Tirupati, Andhra Pradesh, and requesting lodging and entertainment for the officials and their families. Although written on official stationary, the requests made clear that the visits were personal. The Excise Minister's letter stated that he would be visiting in order to "[w]orship."

76.     NARRA sent a similar email and letter from the NARRA TARGET ACCOUNT to SANT's work account in June 2012.

77.     According to Witness 1, he had witnessed in 2009 IIIPL executives trying to persuade Crown Brewery to pay for similar travel, including the lodging at a luxury hotel for a government official and his family when he was traveling for a purported official visit to the brewery, but then only visited a religious site in Tirupati and never saw the brewery.

78.     In general, an email that is sent to a Google or Yahoo! subscriber is stored in the subscriber's "mail box" on Google or Yahoo! servers until the subscriber deletes the email. If the subscriber does not delete the message, the message can remain on Google or Yahoo! servers indefinitely. Even if the subscriber deletes the email, it may continue to be available on Google's or Yahoo!'s servers for a certain period of time.

79.     On September 17, 2013, March 10, 2014, and June 6, 2014, preservation requests were faxed to Google. On June 12, 2014, Google responded to a subpoena for subscriber

17

information for the TARGET ACCOUNTS. According to Google, all accounts were active at the time of its response. At the time of Google's response, the NARRA TARGET ACCOUNT had last been accessed on June 11, 2014. At the time of Google's response, the PBA TARGET ACCOUNT had not been accessed in the previous 180 days.

80. On September 17, 2013, March 10, 2014, and June 6, 2014, preservation requests were faxed to Yahoo!. On June 25, 2014, Yahoo! responded to a subpoena for subscriber information for the TARGET ACCOUNTS. According to Yahoo!, both accounts were active at the time of its response. At the time of the response, the SANT TARGET ACCOUNT had last been accessed on June 23, 2014, and the KUMAR TARGET ACCOUNT had last been accessed on June 25, 2014.

## **BACKGROUND CONCERNING EMAIL**

81. In my training and experience, I have learned that Google and Yahoo! provide a variety of on-line services, including electronic mail ("email") access, to the public. Google and Yahoo! allow subscribers to obtain email accounts at the domain name gmail.com or yahoo.com, like the email accounts listed in Attachment A. Subscribers obtain an account by registering with Google or Yahoo!. During the registration process, Google and Yahoo! ask subscribers to provide basic personal information. Therefore, the computers of Google and Yahoo! are likely to contain stored electronic communications (including retrieved and unretrieved email for Google and Yahoo! subscribers) and information concerning subscribers and their use of Google and Yahoo! services, such as account access information, email transaction information, and account application information. In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users.

18

82.    A Google or Yahoo! subscriber can also store with the provider files in addition to

emails, such as address books, contact or buddy lists, calendar data, pictures (other than ones

attached to emails), and other files, on servers maintained and/or owned by Google or Yahoo!.

In my training and experience, evidence of who was using an email account may be found in

address books, contact or buddy lists, email in the account, and attachments to emails, including

pictures and files.

83.    In my training and experience, email providers generally ask their subscribers to

provide certain personal identifying information when registering for an email account.  Such

information can include the subscriber's full name, physical address, telephone numbers and

other identifiers, alternative email addresses, and, for paying subscribers, means and source of

payment (including any credit or bank account number).  In my training and experience, such

information may constitute evidence of the crimes under investigation because the information

can be used to identify the account's user or users.

84.    In my training and experience, email providers typically retain certain

transactional information about the creation and use of each account on their systems.  This

information can include the date on which the account was created, the length of service, records

of log-in (i.e., session) times and durations, the types of service utilized, the status of the account

(including whether the account is inactive or closed), the methods used to connect to the account

(such as logging into the account via the provider's website), and other log files that reflect usage

of the account.  In addition, email providers often have records of the Internet Protocol address

("IP address") used to register the account and the IP addresses associated with particular logins

to the account.  Because every device that connects to the Internet must use an IP address, IP

19

address information can help to identify which computers or other devices were used to access the email account.

85.    In my training and experience, in some cases, email account users will communicate directly with an email service provider about issues relating to the account, such as technical problems, billing inquiries, or complaints from other users. Email providers typically retain records about such communications, including records of contacts between the user and the provider's support services, as well records of any actions taken by the provider or user as a result of the communications. In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users.

## CONCLUSION

86.    Based on the forgoing, I request that the Court issue the proposed search warrants. Because the warrants will be served on **Google** and **Yahoo!** who will then compile the requested records at a time convenient to it, there exists reasonable cause to permit the execution of the requested warrants at any time in the day or night.

## REQUEST FOR SEALING

87.    I further request that the Court order that all papers in support of this application, including the affidavit and search warrant, be sealed until further order of the Court. These documents discuss an ongoing criminal investigation that is neither public nor known to all of the targets of the investigation. Accordingly, there is good cause to seal these documents because their premature disclosure may seriously jeopardize that investigation.

20

## ATTACHMENT A

### Property to Be Searched

This warrant applies to information associated with pbagencieshyd@gmail.com, and srinarra@gmail.com that is stored at premises controlled by **Google**, a company that accepts service of legal process at 1600 Amphitheatre Parkway, Mountainview, California 94043.


This warrant applies to information associated with rajivsant@yahoo.com and bsnkumar@yahoo.com that is stored at premises controlled by **Yahoo! Inc.**, a company that accepts service of legal process at 701 First Avenue, Sunnyvale, California 94089.

**ATTACHMENT B**

**Particular Things to be Seized**

I.     **Information to be disclosed by Google**

To the extent that the information described in Attachment A is within the possession,

custody, or control of the Provider, including any emails, records, files, logs, or information that

has been deleted but is still available to the Provider, or has been preserved pursuant to a request

made under 18 U.S.C. § 2703(f) on **September 17, 2013, March 10, 2014 and June 6, 2014,**

the Provider is required to disclose the following information to the government for each account

or identifier listed in Attachment A:

    a.     The contents of all emails associated with the account, including stored or

preserved copies of emails sent to and from the account, draft emails, the source and destination

addresses associated with each email, the date and time at which each email was sent, and the

size and length of each email;

    b.     All records or other information regarding the identification of the account, to

include full name, physical address, telephone numbers and other identifiers, records of session

times and durations, the date on which the account was created, the length of service, the IP

address used to register the account, log-in IP addresses associated with session times and dates,

account status, alternative email addresses provided during registration, methods of connecting,

log files, and means and source of payment (including any credit or bank account number);

    c.     The types of service utilized;

    d.     All records or other information stored at any time by an individual using the

account, including address books, contact and buddy lists, calendar data, pictures, and files;

e.      All records pertaining to communications between the Provider and any person regarding the account, including contacts with support services and records of actions taken.

**II.      Information to be disclosed by Yahoo! Inc.**

To the extent that the information described in Attachment A is within the possession, custody, or control of the Provider, including any emails, records, files, logs, or information that has been deleted but is still available to the Provider, or has been preserved pursuant to a request made under 18 U.S.C. § 2703(f) on **September 17, 2013, March 10, 2014, and June 6, 2014**, the Provider is required to disclose the following information to the government for each account or identifier listed in Attachment A:

f.      The contents of all emails associated with the account, including stored or preserved copies of emails sent to and from the account, draft emails, the source and destination addresses associated with each email, the date and time at which each email was sent, and the size and length of each email;

g.      All records or other information regarding the identification of the account, to include full name, physical address, telephone numbers and other identifiers, records of session times and durations, the date on which the account was created, the length of service, the IP address used to register the account, log-in IP addresses associated with session times and dates, account status, alternative email addresses provided during registration, methods of connecting, log files, and means and source of payment (including any credit or bank account number);

h.      The types of service utilized;

i.      All records or other information stored at any time by an individual using the account, including address books, contact and buddy lists, calendar data, pictures, and files;

2

j.      All records pertaining to communications between the Provider and any person

regarding the account, including contacts with support services and records of actions taken.

III.    **Information to be seized by the government**

All information described above in Section I that constitutes evidence of violations of 18

U.S.C. §§ 371 and 1349 (Conspiracy), 18 U.S.C. §§ 1341 and 1343 (Mail and Wire Fraud),

and15 U.S.C. §§ 78dd-1, *et seq.* (the Foreign Corrupt Practices Act), those violations involving

**Rajiv SANT, BSN KUMAR, PB AGENCIES, and Srini NARRA**, and occurring after

**January 2009**, including, for each account or identifier listed on Attachment A, information

pertaining to the following matters:

a.      Payments or promise of payments, directly or indirectly, by or on behalf of ABI,

IIIPL, or related entities to foreign officials in India, or to third-parties for the purpose of paying

foreign officials in India;

b.      Communications and/or correspondence relating to payments or promise of

payments, directly or indirectly, by or on behalf of ABI, IIIPL, or related entities to foreign

officials in India, or to third-parties for the purpose of paying foreign officials in India;

c.      Bank account information utilized by or on behalf of SANT, KUMAR, NARRA,

PB AGENCIES, and/or their co-conspirators relating to the payment of foreign officials in India;

d.      Documents relating to payments or promise of payments, directly or indirectly, by

or on behalf of ABI, IIIPL, or related entities to foreign officials in India, or to third-parties for

the purpose of paying foreign officials in India;

e.      The concealment or disguising of funds obtained as a result of violations of U.S.

or foreign criminal law; and/or

f.      Records relating to who created, used, or communicated with the accounts or

identifier, including records about their identities and whereabouts.

4

## CERTIFICATE OF AUTHENTICITY OF DOMESTIC BUSINESS RECORDS PURSUANT TO FEDERAL RULE OF EVIDENCE 902(11)

I, _____, attest, under penalties of perjury under the laws of the United States of America pursuant to 28 U.S.C. § 1746, that the information contained in this declaration is true and correct. I am employed by Yahoo!, and my official title is _____. I am a custodian of records for Yahoo!. I state that each of the records attached hereto is the original record or a true duplicate of the original record in the custody of Yahoo!, and that I am the custodian of the attached records consisting of _____ (pages/CDs/kilobytes). I further state that:

a. all records attached to this certificate were made at or near the time of the occurrence of the matter set forth, by, or from information transmitted by, a person with knowledge of those matters;

b. such records were kept in the ordinary course of a regularly conducted business activity of Yahoo!; and

c. such records were made by Yahoo! as a regular practice.

I further state that this certification is intended to satisfy Rule 902(11) of the Federal Rules of Evidence.

_____     _____

Date                          Signature

2